JUDGE RAKOFF

11 CV 1461

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACK SHRADER, Individually And On Behalf of All Others Similarly Situated,

Plaintiff,

vs.

FXCM INCORPORATED, DREW NIV, DAVID SAKHAI, WILLIAM AHDOUT, KENNETH GROSSMAN, EDUARD YUSUPOV, ROBERT LANDE, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., and J.P. MORGAN SECURITIES LLC,

Defendants.

CIVIL ACTION NO. ________

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS




JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1. This is a class action brought on behalf of the purchasers of FXCM Incorporated ("FXCM" or "Company") common stock pursuant to its December 2010 Initial Public Offering ("IPO" or "Offering") of 15,060,000 shares of common stock (with an overallotment option of 2,259,000 shares), priced at $14.00 per share. The total price to the public in connection with this offering was over $210.8 million ($226,705,710 with the overallotment option), with underwriters' discounts and commissions totaling over $15.76 million (with the overallotment option).

2. FXCM, its Board of Directors at the time of the IPO, and the Underwriters involved in the Offering (including Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("Citi") and J.P. Morgan Securities LLC ("J.P. Morgan"), are each charged with including or allowing the inclusion of materially false and misleading statements in the Registration

Statement and Prospectus (collectively, "Prospectus") issued in connection with the IPO, in direct violation of the Securities Act of 1933. Specifically, Defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and they also each failed to reveal, at the time the IPO closed that the Company was not proceeding according to plan, that FXCM's growth and trading volume had slowed or weakened by the time of the IPO, which would make it impossible for FXCM to achieve its projected results sponsored and/or endorsed by Defendants prior to and at the time of the IPO. Moreover, Defendants failed to disclose the true nature of its operations.

3. It was only on February 8, 2011 that the truth about FXCM began to be revealed. On that day, a complaint was filed in the Southern District of New York, alleging *inter alia* violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The complaint charged, among other things, that FXCM bilked thousands of customers out of hundreds of millions of dollars using deceptive and unfair trade practices; falsely portrayed its trading platform as a fair, transparent, and true foreign currency market environment free from dealer intervention or manipulation; FXCM interfered with customer trades and traded against its own customers; and that FXCM lured thousands of customers to its trading platform by promoting a "demo account."

4. That complaint further detailed defects and programmed gaffes in the FXCM trading platform, including: slow server command, false error messages, flash trades, arbitrary margin rules, slippage, and slow fill or no fill commands, that were each designed to transfer wealth away from the Company's customers and to FXCM in an illegal and improper manner. Thereafter, as investors soon learned, the effect of these defects and gaffes was that once FXCM customers understood and realized the inherent problems with the FXCM platform, they stopped using it. Accordingly, on

February 16, 2011, as reported by *Barrons.com*, an analyst with Citi downgraded shares of FXCM and reported on the decline in trading customers, in part, as follows:

> Shares of online foreign exchange broker FXCM (FXCM) are down more than 13% today after it reported ***lower trading volume in January from a year earlier.***
>
> The firm, which went public in December, generated an average of 307,689 retail client trades per day in January. That was down 7% from a year earlier but up 11% from the prior month. Its total retail-customer trading volume rose 5% on year to $258 billion, which was up 8% from December.
>
> Analyst William Katz at Citi (C) lowered his rating on the stock from buy to hold. He wrote in a note that last month's results were "substantially" below expectations. "And, with February off to a sluggish start, the data call into question our 2011-12 … growth assumptions and ***begin to suggest potentially greater maturity in the business than previously contemplated,*** " Katz added. [Emphasis added].

5. On this news, FXCM stock declined from a close of $13.70 per share on February 15, 2011, to close at $12.05 per share the following day on extremely heavy volume of 2.48 million shares traded. Moreover, as the market continued to digest the adverse news about FXCM, shares of the Company continued to trade lower, reaching a low of $11.22 per share on February 23, 2010 - within only four trading days of the February 15 downgrade.

**JURISDICTION AND VENUE**

6. The Securities Act claims asserted herein arise under Sections 11 and 15 of the Securities Act [15 U.S.C. §§ 77k and 77o] and rules promulgated thereunder by the United States Securities and Exchange Commission ("SEC").

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 22 of the Securities Act [15 U.S.C. § 77v].

8. Defendants named herein have sufficient minimum contacts with this District, state, and the United States so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and Section 22 of the Securities Act [15 U.S.C. § 77v]. Defendant FXCM maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

10. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiff

11. Plaintiff JACK SHRADER purchased shares of FXCM common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the December 2010 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### Corporate Defendant

12. Defendant **FXCM INC.** is incorporated in Delaware and headquartered at Financial Square, 32 Old Slip, 10th Floor, New York, New York 10005. Since the time of the IPO, FXCM stock traded on the New York Stock Exchange. Primarily, the Company is an online provider of foreign exchange, or FX, trading and related services to approximately 175,000 retail and institutional customers globally. FXCM maintains subsidiaries located in the United States, Hong

Kong, England and Wales, New Zealand, and Japan.

13. The individuals identified as defendants in subparagraphs (a) - (f) below, are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the false statements contained in the materially false and misleading Registration Statement. The Individual Defendants include the following:

(a) **DREW NIV** ("Niv") is, and at all relevant times has been, the Chairman of the Board of Directors and Chief Executive Officer of FXCM since 1999 and is one of the original founding partners of the firm. Defendant Niv signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the December 2010 IPO. As a result of the IPO, FXCM paid Defendant Niv over **$30.0 million** from the IPO proceeds to purchase his Holding Units in FXCM.

(b) **DAVID SAKHAI** ("Sakhai") is, and at all relevant times has been, a Director and Chief Operating Officer of FXCM since 1999 and is one of the original founding partners of the firm. Defendant Sakhai signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the December 2010 IPO. As a result of the IPO, FXCM paid Defendant Sakhai over **$20.3 million** from the IPO proceeds to purchase his Holding Units in FXCM.

(c) **WILLIAM AHDOUT** ("Ahdout") is, and at all relevant times has been, a Director and Chief Dealer and Managing Director of FXCM since 1999 and is one of the original founding partners of the firm. Defendant Ahdout signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the December 2010 IPO. As a result of the IPO, FXCM paid Defendant Ahdout

over **$8.28 million** from the IPO proceeds to purchase his Holding Units in FXCM.

(d) **KENNETH GROSSMAN** ("Grossman") is, and at all relevant times has been, a Director and Managing Director of FXCM since 1999 and is one of the original founding partners of the firm. From 1999 to 2007, Defendant Grossman was also the Chief Financial Officer of FXCM. Defendant Grossman signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the December 2010 IPO. As a result of the IPO, FXCM paid Defendant Grossman over **$7.48 million** from the IPO proceeds to purchase his Holding Units in FXCM.

(e) **EDUARD YUSUPOV** ("Yusupov") is, and at all relevant times has been, a Director of FXCM and has been its Chief Dealer and Managing Director since 1999. Defendant Yusupov is one of the original founding partners of FXCM. Defendant Yusupov signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the December 2010 IPO. As a result of the IPO, FXCM paid Defendant Yusupov over **$26.67 million** from the IPO proceeds to purchase his Holding Units in FXCM.

(f) **ROBERT LANDE** ("Lande") is, and at all relevant times has been, the Chief Financial Officer of FXCM and joined the firm in January 2010. Defendant Lande signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the December 2010 IPO.

**<u>IPO Underwriter Defendants</u>**

14. In connection with the December 2010 Initial Public Offering, **CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC.,** and **J.P. MORGAN**

**SECURITIES LLC** (collectively, "Underwriter Defendants"), acted as Lead or Representative Underwriters of the Offering, facilitating the distribution of over 15.060 million shares of FXCM stock to investors and initiating the first public market for FXCM shares. Excluding the oversubscription allotment of an additional 2,259,000 million shares, the distribution of the FXCM shares awarded Underwriters in the IPO occurred, as follows:

| Underwriter | Shares |
| --- | --- |
| Credit Suisse Securities (USA) LLC | 4,781,550 |
| J.P. Morgan Securities LLC | 3,915,600 |
| Citigroup Global Markets Inc. | 1,995,450 |
| Deutsche Bank Securities Inc. | 1,656,600 |
| Barclays Capital Inc. | 1,506,000 |
| Sandler O'Neill & Partners, L.P. | 753,000 |
| UBS Securities LLC | 451,800 |
| **Total** | **15,060,000** |

15. In connection with the December 2010 IPO, the Underwriters and Underwriter Defendants were paid at least $15.76 million – not including any additional fees paid in connection with the sale of shares sold in connection with the Underwriters oversubscription agreement. The Underwriters and Underwriter Defendants were paid at least $0.91 per share in connection with the 15.06 million shares sold.

16. Shareholders were willing to, and did, pay over $15.76 million in combined fees and an additional $6.8 million in expenses to compensate the Underwriters and Underwriter Defendants for conducting a purported significant "due diligence" investigation into FXCM in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the Initial Public Offering, and this was supposed to provide investors with important safeguards and protections.

17. The due diligence investigation that was required from the Underwriter Defendants included a detailed investigation into FXCM trades, systems, platforms, costs, expenses, sales, accounting, controls, and procedures, and it also required them to test the assumptions and verify the projections adopted or ratified by Defendants, to the extent a reasonable investor with access to such confidential corporate information would. A reasonable due diligence investigation would have extended well beyond a mere casual view of FXCM books and records, and its accounting, financial report, and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

18. In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about FXCM's business, systems, trades, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

19. In addition to the Underwriting Defendants, it is also appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly-defined group of Defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the

Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, systems, trades, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

20. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC, and was traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, systems, trades, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock in December 2010 violated these specific requirements and obligations.

**MATERIALLY FALSE & MISLEADING STATEMENTS**
**<u>IN THE REGISTRATION STATEMENT AND PROSPECTUS</u>**

21. On December 7, 2010, FXCM published a release announcing that the Company had closed its initial public offering of 17.319 million shares. This release stated, in part, the following:

> On December 1, 2010, FXCM Inc. completed its initial public offering, including the

exercise in full by the underwriters of their option to purchase additional shares, by issuing 17,319,000 shares of Class A common stock for cash consideration of $13.09 per share (net of underwriting discounts) to a syndicate of underwriters led by Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC and Citigroup Global Markets Inc. as joint book-running managers for the offering. Barclays Capital Inc., Deutsche Bank Securities Inc., Sandler O'Neill & Partners, L.P. and UBS Securities LLC acted as co-managers.

22. In connection with the Company's IPO, on or about December 1, 2010, a registration statement was declared effective by the Securities and Exchange Commission, and a final prospectus for the Offering was filed with SEC pursuant to Form 424(b)4. As described in the Prospectus, FXCM extolled its technology platform and conflict-free agency model:

> ***We offer our customers access to over-the-counter, or OTC, FX markets through our proprietary technology platform.*** In a FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair". Our platform presents our FX customers with the best price quotations on up to 56 currency pairs from up to 25 global banks, financial institutions and market makers, or FX market makers, which we believe provides our customers with an efficient and cost-effective way to trade FX. ***We utilize what is referred to as agency execution or an agency model. When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker.*** We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses.
>
> Our agency model is fundamental to our core business philosophy because we believe that ***it aligns our interests with those of our customers, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers....***
>
> * * *
>
> Our list of products is largely limited to those we are now, or in the future will be, able to offer on an agency model basis. Because we earn our fees based on transaction volume, ***we design our products and services to make it easier for our customers to trade. For example, to help our customers trade more profitably, we offer research without charge on aggregate trading trends, one-click trading (which enables customers to execute a trade with a single click after setting up preferred trading parameters) and price improvements for price changes that may***

> ***occur between order placement and execution on all order types.*** [Emphases added].

23. Moreover, Defendant extolled the variety of products offered by FXCM, designed to condition investors to believe that customers of all skill levels would be attracted to FXCM's trading platform:

> We offer our customers various trading alternatives based on customer sophistication, from beginner to expert, and modes of access, from smart phones to web-based interfaces to downloadable desktop applications. Our primary trading application is award-winning Trading Station II, a desktop application. We also offer Active Trader, an internet application targeted at active equity traders. We have also introduced a trading application designed for customers who create automated trading strategies, a growing and more active segment of the retail FX trading population. Additionally, we offer our customers services without charge to help them automate their trading strategies, connect their automated trading systems to our platform and to host their strategies on our platform.

24. As further stated in the Prospectus, Defendants touted the advantage of FXCM's proprietary technology platform as virtually unique in the industry:

> ***In the retail FX industry, the technology and infrastructure required to implement the agency model from customer trading screen through settlement is not widely available. We have built our proprietary technology platform over the last 11 years to handle the complete lifecycle of a FX trade, as well as customized connections to our network of FX market makers and a full suite of back office and administrative systems. We have developed an award-winning single technology platform*** that provides over 600 prices per second for 81 currency pairs/contracts-for-difference, or CFDs, and processes over 500,000 trades per day from a pool of approximately 175,000 customers who can access the system in 16 languages. Third-party alternatives to provide the agency model for FX trading were principally designed for the institutional market and have significant limitations when used for retail FX. This generally increases the cost and time a principal broker is forced to spend if they were to try to make a conversion to an agency model. [Emphasis added].

25. In truth, however, these statements were materially untrue and misleading because FXCM portrayed, developed, devised, and implemented a platform that was not fair, not free from

conflict, not transparent, and not a true foreign currency market environment free from dealer intervention or manipulation. As detailed in the above-referenced RICO complaint, FXCM's purported technology platform was also designed with such inherent flaws as:

a. **Slow Server Command:** When a customer is engaged in profitable trading activity, Defendant routes the customer's account to a "slow server," causing trade execution to be slowed down, and allowing Defendant the time to hijack any potential profit in the trade by buying and selling in-between the customer's order and the real market, with Defendant's taking any profit and leaving the customer victimized with no money for his or her effort;

b. **False "Error" Messages:** Defendant uses its administrative back-end software to prevent the customer from closing out a profitable trade and instead causes the trading system to generate any one of a series of "error" messages to the customer, blocking the customer's efforts to finalize what would have been a profitable order;

c. **Flash Trades:** Defendant, in a practice known as "stop hunting," manipulates the market price of the traded currency, including printing bogus "flash trades" which move the "market" to trigger the customer's stop order for a given trade, essentially closing the customer out of that trade;

d. **Arbitrary Margin Rules:** Defendant arbitrarily changes the margin rules on Fridays for an ensuing week without any notice to the customer, which results in the customer's being deprived of any trading advantages or leverage opportunities they may have, and again causing the customer's account to be closed out in favor of Defendant;

e. **Abuse of "Slippage":** Defendant, in a practice known as "slipping a trade," takes advantage of "slippage" in a given trade. "Slippage" is the change in price between the time when a price is quoted and a market order is placed. It is customarily caused by market movement while the trade is being executed. The incidence of "slippage" should roughly be equal in favor of the customer and the broker. Defying all laws of probability, in almost every case, Defendant's customers suffer losses as a result of "slippage" at grossly greater percentages than Defendant does, which can only be explained by Defendant's manipulation of pricing; and

f. **"Slow Fill" and "No Fill" Commands:** Defendant often fails to execute valid and profitable trade orders entered by the customer and instead causes the trading system to generate a "slow fill" or "no fill" message to the customer as the customer attempts to close out a profitable trade, preventing the customer from making a profit while generating illicit profits for Defendant.

26. As a result of the foregoing problems, at the time of the IPO, many of FXCM's customers had already abandoned the Company and had stopped using FXCM and its platforms. Additionally, rather than report that the Company had already been experiencing a decline or leveling off in customer numbers and overall trades, thus impacting growth and revenue, the Registration Statement instead conditioned investors to believe that the Company was continuing to and would experience strong growth:

> Our revenues have grown from $12.3 million in 2001 to $322.7 million in 2009, a compound annual growth rate, or CAGR, of 55%. Our income before income taxes has grown from $5.3 million in 2001 to $97.0 million in 2009, a CAGR of 43.8%, although income before income taxes declined from $129.0 million in 2008. Our revenues were $264.2 million and our income before income taxes was $82.9 million in the nine months ended September 30, 2010, as compared to $248.1 million and $76.0 million, respectively, in the nine months ended September 30, 2009.
>
> * * *
>
> Despite the strong growth of the retail FX market, online retail FX investors still represent a small fraction of the total population of online investors. According to internal estimates by the Aite Group, as of July 2010, there were over 100 million retail equity traders globally, but only 1.25 million retail FX traders. ***Overall awareness of FX continues to grow among investors, driven in part by increased media coverage and the central role FX plays in the global economy. Also, since retail FX is an asset class that can be traded 24 hours per day, five days a week, it is convenient to trade for many online investors as they can trade at any time of the day.*** Unlike equities, fixed income, real estate and many other asset classes, FX markets do not experience periods where all assets move in one direction or another. As a result, the FX market is not necessarily correlated to other assets popular with online investors, such as equities or options, and we believe that, as an increasing number of investors realize this, retail FX will attract more attention as a way to increase portfolio diversification. [Emphases added].

27. Further, the Prospectus conditioned investors to believe that revenue was on upward trajectory in reporting the growth experienced for the nine months ended September 2010, from the same nine month period in 2009:

Retail trading revenue increased by $9.4 million or 4.2% to $234.6 million for the nine months ended September 30, 2010 compared to the nine months ended September 30, 2009. The increase is attributable to an increase in markup on retail trading revenue, primarily due to the inclusion of revenues from CFD trading, a new product offering introduced in September 2009, increased payments for order flow and higher fees from our white label relationships.

Institutional trading revenue increased by $5.4 million or 35.2% to $20.8 million for the nine months ended September 30, 2010 compared to the nine months ended September 30, 2009. Our institutional business grew through continuing expansion of its customer base and a reduction in the number of competitors in 2009.

28. Although the Company warned that "[o]ur revenue is influenced by the general level of trading activity in the FX market [and] [o]ur revenue and operating results may vary significantly from period to period due primarily to movements and trends in the world's currency markets and to fluctuations in trading levels," Defendants never disclosed that its business had already matured and that future growth projections could not be sustained. Neither did Defendants reveal that attrition from its trading platforms was increasing as more and more traders realized that the Company's trading platform was rigged and manipulated, and that FXCM was abusing their trust for its illicit gains.

**The True Financial and Operational Condition of**
**FXCM is Belatedly Disclosed**

29. It was only on February 8, 2011 that the truth about FXCM began to be revealed. On that day, a complaint was filed in the Southern District of New York, alleging *inter alia* violations of the Racketeer Influenced and Corrupt Organizations Act. The complaint charged, among other things, that FXCM bilked thousands of customers out of hundreds of millions of dollars using deceptive and unfair trade practices; falsely portrayed its trading platform as a fair, transparent, and true foreign currency market environment free from dealer intervention or manipulation; FXCM

interfered with customer trades and traded against its own customers; and that FXCM lured thousands of customers to its trading platform by promoting a "demo account."

30. The true impact of FXCM's trade manipulation then materialized days later, when it became known, on February 16, 2011, as reported by *Barrons.com*, that client trades had declined and an analyst with Citi downgraded the stock:

> Shares of online foreign exchange broker FXCM (FXCM) are down more than 13% today after it reported ***lower trading volume in January from a year earlier***.
>
> The firm, which went public in December, generated an average of 307,689 retail client trades per day in January. That was down 7% from a year earlier but up 11% from the prior month. Its total retail-customer trading volume rose 5% on year to $258 billion, which was up 8% from December.
>
> Analyst William Katz at Citi (C) lowered his rating on the stock from buy to hold. He wrote in a note that last month's results were "substantially" below expectations. "And, with February off to a sluggish start, the data call into question our 2011-12 ... growth assumptions and ***begin to suggest potentially greater maturity in the business than previously contemplated***," Katz added. [Emphasis added].

31. On this news, FXCM stock declined from a close of $13.70 per share on February 15, 2011, to close at $12.05 per share the following day on extremely heavy volume of 2.48 million shares traded. Moreover, as the market continued to digest the adverse news about FXCM shares of the Company continued to trade lower, reaching a low of $11.22 per share on February 23, 2010 - within only four trading days of the February 15 downgrade.

## CLASS ACTION ALLEGATIONS

32. This is a class action on behalf of all persons who purchased FXCM shares or traceable stock pursuant to the December 2010 Registration Statement and Prospectus (the "Class"), excluding Defendants. Class members are so numerous that joinder of them all is impracticable.

33. Common questions of law and fact predominate and include: (i) whether Defendants:

violated the Securities Act; (ii) whether the FXCM IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

34. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### For Violations of §11 of the Securities Act Against All Defendants and §15 of the Securities Act

35. Plaintiff incorporates each and every allegation above as if stated herein.

36. The Individual Defendants each signed FXCM's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors. The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

37. On or about December 1, 2010, Defendants named in this Claim for Relief completed an IPO of 17,319,000 shares of FXCM's common stock at $14.00 per share, for total proceeds from the IPO of $242.47 million.

38. Each of the statements alleged herein relating to FXCM's prospects and financial results made in the December 2010 Prospectus and Registration Statement were false or misleading when issued. The true but concealed facts were that defendants could not operate the Company according to plan and that Defendants could not operate the Company in accordance with the expectations sponsored and/or endorsed by the Individual Defendants.

39. All Defendants named in this Claim for Relief, with the exception of FXCM (the issuer whose liability for the misstatements and omissions is absolute), owed to the purchasers of the

stock, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to ensure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

40. The officers and directors of FXCM who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement. By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, plaintiff and the Class have been damaged.

41. By reason of the conduct herein alleged, each Defendant named in this Claim for Relief violated §11 of the Securities Act. The Individual Defendants, by reason of their stock ownership and positions with FXCM, were controlling persons of FXCM and are liable under §15 of the Securities Act.

## PRAYER

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 2, 2011

KIM MILLER (KM-6996)
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

LEWIS KAHN
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

**Attorneys for Plaintiff**

**CERTIFICATION PURSUANT TO SECURITIES LAWS**

JACK SHRADER (name) ("Plaintiff") declares, as to the claims asserted under the federal securities law, that:

1. Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.
2. Plaintiff did not purchase securities of **FXCM, Inc.** at the direction of counsel or in order to participate in a private action under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. During the Class Period, Plaintiff has executed transactions in the securities of **FXCM, Inc.** as follows. See attached Schedule.
5. In the last three years, Plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.
6. Plaintiff will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 3-1-, 2011

[signature]
Plaintiff Signature

JACK SHRADER
Printed Name

Name of Plaintiff: [signature]

Schedule of Plaintiff's Transaction(s) in: **FXCM, Inc.**

Purchase(s):

| Date | Units | Price |
| --- | --- | --- |
| 2-1-11 | 300 | 14.3899 |